## Richmond

## LINDA DIANE KING V. COMMONWEALTH OF VIRGINIA.

January 14, 1977.

Record No. 760543.

Present, All the Justices.

*Charles E. Carter*, for plaintiff in error.

*Jerry P. Slonaker, Assistant Attorney General (Andrew P. Miller, Attorney General*, on brief), for defendant in error.

COCHRAN, J., delivered the opinion of the court.

The trial court, sitting without a jury, tried the defendant Linda Diane King on two indictments charging her with involuntary manslaughter in the deaths of Gladys Harraway Motley and John Bannister Harraway, resulting from an automobile accident. Finding the defendant guilty on each charge, the court by order entered January 2, 1976, sentenced her to confinement in jail for 12 months and payment of a $1,000 fine on one conviction, and confinement in the penitentiary for five years on the other, and ordered suspension of her operator's license for a period of 12 months on each charge. The

penitentiary sentence was suspended during a period of supervised probation.

The accident in which Mrs. Motley and Mr. Harraway were fatally injured occurred on May 18, 1975, at approximately 11:30 p.m. on U. S. Route 29 at its intersection with Route 721 about 2.3 miles north of the city of Danville in Pittsylvania County. The weather was clear; Route 29, a four-lane divided highway, was dry and unlighted. The speed limit was 55 miles per hour. The decedents were passengers in a green 1972 Dodge four-door sedan operated by Mrs. Motley's husband, Augustine Jones Motley, which proceeded south on Route 29 into the turning lane, a third southbound lane, at the Route 721 intersection, began to move eastwardly across the northbound lanes of Route 29 towards Route 721, and was struck by a red 1970 Plymouth Barracuda two-door automobile operated by the defendant in a northerly direction on Route 29. State Trooper J. W. Minter, the investigating officer, established the point of impact in the right-hand northbound lane of Route 29. He found skid marks leading from this point to the wrecked vehicles, and determined from the damage that the Motley vehicle had been struck in its right side by the front of the King automobile.

Minter testified that when he questioned King the next day she informed him that she had been at Hardee's Restaurant and was driving home at 45 to 50 miles per hour; that she was "real close" to the Motley car when she first saw it; that she thought she applied her brakes but did not have time to slide; that she stated that she had her lights "on"; and that she had drunk a cup of wine about 6:00 p.m. on the evening of the accident.

Augustine Jones Motley, 76 years of age, testified that he, his wife, and her brother were returning home after visiting a friend; that he was going south on Route 29 to turn east on Route 721 and proceed to Route 360, on which he lived; that he remained stopped in the turning lane at the intersection of Routes 29 and 721 for "probably sixty seconds or longer" to permit northbound cars on Route 29 to pass the intersection; that he observed the cars in the darkness by their headlights; that when he started to cross the northbound lanes he did not see any car lights, although he could see approximately 400 feet down the road; and that he received head injuries and remembered nothing about the collision.

Robert T. Calvert testified, over objection, that at

approximately 11:30 p.m. he was driving north on Route 29 about 45 miles per hour at the Danville city limits, when a red Barracuda, with only amber parking lights shining, came close behind him. After staying behind him for a few seconds the Barracuda passed him at a high rate of speed, which he estimated at 60 to 70 miles per hour. Calvert continued on his way and "just a couple of minutes" later came across the wreck in which he identified the Barracuda as one of the two vehicles involved.

William E. Hickson, Jr., a University of Virginia student, testified that he was driving south on Route 29; that he observed the Motley vehicle stopped in the turning lane approximately 10 to 15 seconds, after which it started across the highway; that he saw a "vehicle coming over the hill with no headlights on" but with "very, very dim" amber "running lights or parking lights" burning; that neither car slowed down before they collided; and that he could not estimate the speed of the Barracuda.

Barnard B. Shelton, Jr., testified that he lived in a trailer one tenth or two tenths of a mile south of the scene of the accident; that he did not see the accident but heard it; that cars frequently raced on the highway; that two to three seconds before he saw a flash and heard the collision he had heard a vehicle that "was strung out, in other words, it sounded like it would do all it would do"; that he went to the scene, saw, and heard the defendant outside the Barracuda "screaming to get the other girl out . . . and she said it was her fault."

King, 20 years of age, testified in her own defense. She insisted that her headlights were burning; that she was driving from 45 to 50 miles per hour when Motley drove in front of her not more than 50 to 75 feet ahead; that her car was noisy; that she was looking at her own lane of travel and did not see the lights of the Motley car until it pulled in front of her; and that she had said at the scene that the accident was not her fault, that "the guy pulled out in front" of her. She had about a cup of wine at home at 6:00 p.m., then had something to eat, and drove to Skate Town with Sandra Towler. They left there about 11:00 p.m. and stopped at Hardee's Restaurant on the way home.

The defendant's testimony was corroborated by that of her passenger, Sandra Towler. Another witness called by the defendant was a friend, Ronnie Dickerson, who testified that he saw the accident as he was driving south on Route 29; that when

the Motley vehicle was stopped at the side road the headlights of the King car were visible "coming over the hill"; and that the Motley vehicle pulled out in front of King when she was about 75 feet away.

By letter opinion dated December 2, 1975, the trial court ruled that the Commonwealth's evidence established beyond a reasonable doubt that King "was operating her motor vehicle at an excessive rate of speed and without headlights required by statute" and that this was sufficient to constitute involuntary manslaughter. In its opinion the trial court relied on this definition of involuntary manslaughter as restated in *Beck* v. *Commonwealth*, 216 Va. 1, 4, 216 S.E.2d 8, 9 (1975):

> "Involuntary manslaughter is the killing of one accidentally, contrary to the intention of the parties, in the prosecution of some unlawful, but not felonious, act; or in the improper performance of a lawful act."

The court cited *Bell* v. *Commonwealth*, 170 Va. 597, 195 S.E. 675 (1938), as controlling authority for the principle that contributory negligence, an available defense in a civil action for personal injuries or death by wrongful act, has no place in an involuntary manslaughter case if the criminal negligence of the defendant is found to be the cause of death.

In accordance with familiar principles we must consider the evidence in the light most favorable to the Commonwealth. Moreover, as the trial court sat without a jury its judgment is entitled to the same weight as a jury verdict, and will not be disturbed by us unless plainly wrong or without evidence to support it. *Evans* v. *Commonwealth*, 215 Va. 609, 612-13, 212 S.E.2d 268, 271 (1975).

Code § 46.1-268 (Repl. Vol. 1974) required every vehicle upon a highway to display lighted head lamps at night. As King conceded, there was evidence that her vehicle was not displaying such lights, and this evidence, therefore, supports the trial court's finding that King was operating in violation of the headlight statute.

The trial court's finding of excessive speed, necessarily based upon the testimony of Calvert and Shelton, presents a more difficult question. We have been reluctant to permit an inference of excessive speed at one place on a highway from evidence of such speed at another place. Thus, in *Grinstead* v.

*Mayhew,* 167 Va. 19, 187 S.E. 515 (1936), we held that excessive speed 1-¹/₄ miles from the scene of the accident did not of itself permit the inference of excessive speed at the time of the accident. More recently, however, we have left the admissibility of such evidence to the discretion of the trial court. In *Slate* v. *Saul,* 185 Va. 700, 40 S.E.2d 171 (1946), the admission of evidence of speed at a point ¹/₂ mile to 1-¹/₅ miles away was held not to be an abuse of discretion. And, in *Interstate Veneer Co.* v. *Edwards,* 191 Va. 107, 60 S.E.2d 4 (1950), we upheld the trial court's admission of evidence of speed ³/₄ mile from the place of collision, where another witness testified to the same speed 400 yards from the accident scene and the physical facts evidenced high speed at impact.

We have held that a witness who did not see the vehicle in movement is incompetent to testify from sound alone as to its speed. *Meade, Adm'r* v. *Meade, Adm'r,* 206 Va. 823, 828-29, 147 S.E.2d 171, 175 (1966). *See Laubach* v. *Colley,* 283 Pa. 366, 129 A. 88, 89 (1925); Annot., 33 ALR3d 1405 (1970). In the present case, Shelton did not see the King car before the accident. He testified, without objection, as to the sound of speeding made by a car which passed his trailer a few seconds before he heard the collision. But this alone is not sufficient to establish unlawful speed. We conclude that the trial court's finding of excessive speed at the time of collision is without evidence to support it. The only evidence that King was driving in excess of the speed limit came from a witness who last saw her vehicle before the accident more than two miles from the scene of the collision.

■ The question remains whether the finding of the trial court that King's violation of the headlight statute was a proximate cause of the deaths is sufficient to support the manslaughter conviction.

The Attorney General, while conceding that violation of a statute is only ordinary negligence, argued before us that *Beck* correctly restated the principle that any statutory violation that proximately causes death constitutes involuntary manslaughter. We do not agree. The Commonwealth's construction of *Beck* is too broad.

In *Richardson* v. *Commonwealth,* 192 Va. 55, 63 S.E.2d 731 (1951), we expressly stated that violation of the statutes defining reckless driving and prescribing motor vehicle traffic regulations is insufficient to bring the negligent act within the

common law definition of manslaughter unless it is so flagrant, culpable, and wanton as to show utter disregard of the safety of others under circumstances likely to cause injury. We noted there that some states had provided by statute that a simple act of negligence which results in death is a crime. *See* Annot., 20 ALR3d 473 (1968). And in *Bell* v. *Commonwealth, supra,* we held that the evidence, which showed that the defendant was driving without lights on the wrong side of the street, in violation of the law, was sufficient to justify the jury in finding the defendant guilty of involuntary manslaughter under instructions requiring proof of gross, wanton, and culpable negligence. *See also Lewis* v. *Commonwealth,* 211 Va. 684, 179 S.E.2d 506 (1971); *Goodman* v. *Commonwealth,* 153 Va. 943, 952, 151 S.E. 168, 171 (1930); Annot., 99 ALR 756 (1935).

We acknowledge that, when read out of the factual context in which it was used, some of the language found in *Beck* and other cases may be susceptible to the overly broad interpretation urged by the Attorney General. In *Beck,* and in *Albert* v. *Commonwealth,* 181 Va. 894, 902, 27 S.E.2d 177, 180 (1943), we held that driving under the influence of intoxicants which proximately results in death constitutes involuntary manslaughter. Other statutory violations do not necessarily fall into the same category, depending upon the nature and extent of the offenses. Inadvertent acts of negligence without recklessness, while giving rise to civil liability, will not suffice to impose criminal responsibility. Thus, we have held that mere failure to keep a proper lookout is insufficient to support a conviction of involuntary manslaughter. *Lewis* v. *Commonwealth, supra,* 211 Va. at 687-88, 179 S.E.2d at 509. Intentional, willful, and wanton violation of safety statutes, resulting in death, however, will justify conviction of involuntary manslaughter. *See State* v. *Cope,* 204 N.C. 28, 167 S.E. 456 (1933). The degree of negligence must be more than ordinary negligence. *Smith* v. *Commonwealth,* 213 Va. 781, 784, 195 S.E.2d 845, 847-48 (1973); *Fadely* v. *Commonwealth,* 208 Va. 198, 202, 156 S.E.2d 773, 776 (1967); *Zirkle* v. *Commonwealth,* 189 Va. 862, 868, 55 S.E.2d 24, 28 (1949); *Bell* v. *Commonwealth, supra,* 170 Va. at 615, 195 S.E. at 681.

In the operation of motor vehicles violation of a safety statute amounting to mere negligence proximately causing an accidental death is not sufficient to support a conviction of involuntary

manslaughter. Likewise, the improper performance of a lawful act proximately causing an accidental killing is also insufficient unless that improper performance constitutes criminal negligence.

We conclude that involuntary manslaughter arising from the operation of a motor vehicle should be predicated solely upon criminal negligence proximately causing death. Accordingly, we define involuntary manslaughter in the operation of a motor vehicle as the accidental killing which, although unintended, is the proximate result of negligence so gross, wanton, and culpable as to show a reckless disregard of human life.

Applying this definition in the present case, we hold that the evidence is insufficient to support King's conviction. There is nothing to indicate that the trial court found such gross, wanton, and culpable negligence as to show a reckless disregard of human life. There was a finding of statutory violations which we believe the trial court concluded was sufficient to convict under *Beck*. The evidence at most, however, showed only an inadvertent failure by King to turn on her white headlights rather than her amber running or parking lights. On the record before us we hold that this act of omission was no more than ordinary negligence, an insufficient predicate for a conviction of involuntary manslaughter.

Accordingly, the judgment of the trial court will be reversed and the case remanded for a new trial if the Commonwealth be so advised.

*Reversed and remanded.*

POFF, J., dissenting.

I believe the judgment should be affirmed.

The majority hold that an "inadvertent" violation of the headlights statute, standing alone, is insufficient to support a finding of criminal negligence. I agree. But, as I read their opinion, the majority would have affirmed the judgment if they had considered the evidence sufficient to support the trial court's finding of excessive speed. Such a holding would accord with the rule that, while a single tortious act may amount to nothing more than simple negligence, when multiple tortious acts conjoin as proximate causes of a killing, the cumulative effect

may constitute negligence so gross, wanton, and culpable as to show a reckless disregard of human life. Applying that rule, we have held that driving at night without headlights on the wrong side of the road may constitute criminal negligence. *Bell* v. *Commonwealth*, 170 Va. 597, 195 S.E. 675 (1938).

The trial court's finding that defendant violated the headlights statute was based upon conflicting evidence; so was its finding concerning defendant's speed. The majority accept the first finding of fact but reject the second. I would accept both.

With respect to speed, the finding upon which the judgment was based was not a finding of a violation of the statutory speed limit but a finding that defendant "was operating her motor vehicle at an excessive rate of speed". Driving at an excessive rate of speed is an act of negligence. If the finding was justified by the evidence, and if this act of negligence and the headlights violation converged as proximate causes of death, the cumulative effect could, as in *Bell*, constitute criminal negligence.

The trial court's finding of excessive speed, the majority say, was "necessarily based upon the testimony of Calvert and Shelton". Not necessarily. By her own admission, defendant had traveled at night more than two miles along a primary highway at a speed of 45 to 50 m.p.h. The open highway was not lighted, and disinterested witnesses testified that defendant's white headlights were not burning. The purpose of the headlights statute is not only to enable the driver to maintain a proper lookout, but also to alert other users of the highway to the presence, proximity, and movement of his vehicle. Arguably, a fact-finder could reasonably conclude *from this evidence alone* that such a speed, albeit within the statutory limit, was excessive under the circumstances.

But this evidence was not the only evidence of excessive speed. The majority do not say, nor could they, that the testimony of Calvert and Shelton was inadmissible. As an examination of decided cases will show, their testimony was competent and entitled to such weight as the fact-finder chose to give it.

Calvert estimated defendant's speed of 60 to 70 m.p.h. at a point 2.3 miles south of the collision. True, as the majority say, we have held that evidence of excessive speed 1-1/4 miles from the place of an accident "is not of itself sufficient to warrant the inference that such excessive speed obtained at the time of the accident." *Grinstead* v. *Mayhew*, 167 Va. 19, 23, 187 S.E. 515, 517

(1936). But in that same holding we expressly recognized that such evidence was "admissible on the ground of probative value". *Id.; accord, Slate* v. *Saul,* 185 Va. 700, 40 S.E.2d 171 (1946).

Shelton did not see defendant's vehicle as it passed his home, and gave no estimate of its rate of speed, but he testified that it sounded as if it "was strung out, in other words, it sounded like it would do all it would do". In *Meade, Adm'r* v. *Meade, Adm'r,* 206 Va. 823, 828-29, 147 S.E.2d 171, 175 (1966), cited by the majority, we held that a witness who had not seen a vehicle was "incompetent to give testimony based on sound alone as to the speed at which it was moving." But in a later case where the witness, who had heard but not seen the vehicle at the time of the accident, did not attempt to estimate its speed, we held that the rule in *Meade* was not applicable and that the witness' testimony concerning sound was competent evidence. *Smith* v. *Commonwealth,* 213 Va. 781, 783-84, 195 S.E.2d 845, 847 (1973).

The trial court was further entitled to consider what we have called the "mute evidence of high speed." *Interstate Veneer Co.* v. *Edwards,* 191 Va. 107, 112, 60 S.E.2d 4, 6 (1950).

"[A]lthough the uncontradicted oral testimony was that a vehicle involved in a collision was traveling at from twenty to thirty-five miles per hour, yet the jury might infer from the force of the impact, the damage to the vehicles involved, the distance they traveled from the point of impact before coming to rest, and other circumstances, that it was traveling at a much greater speed." *Davis* v. *Webb,* 189 Va. 80, 85, 52 S.E.2d 141, 143 (1949).

Here, the investigating officer testified that there was damage to the front, hood, windshield, and both doors of defendant's two-door car and "extensive damage up and down" the right side of the other car; that defendant's car left no skid marks prior to impact; that a "deep gouge mark" and three skid marks led to the place the other car came to rest; and that one of the decedents was "pinned in" the front passenger seat and the other was found outside the car on the eastern shoulder of the road north of the intersection. This decedent, according to the Medical Examiner's Report (an exhibit introduced without objection), "was thrown approximately 20 ft. from car and apparently struck a stop sign in flight breaking it off at ground level."

Considering this evidence, complemented by the photographs taken the night of the accident and the next day, it appears that the impact was great enough to force a large four-door sedan occupied by three adults a substantial distance in a direction lateral to its line of travel. This evidence of defendant's speed, though mute, is eloquent.

Applying the rule that the evidence must be viewed on appeal in the light most favorable to the Commonwealth and the rule that facts resolved by the fact-finder will not be disturbed by this Court unless plainly wrong or without evidence to support them, I would uphold both factual findings and affirm the trial court's judgment that defendant was guilty of criminal negligence.

CARRICO, J., joins in this dissent.