# Richmond

## VIRGINIA ELECTRIC AND POWER COMPANY, A CORPORATION v. HARRY T. WRIGHT.

### April 28, 1938.

### Present, All the Justices.

The opinion states the case.

*T. Justin Moore, Edmund M. Preston* and *Archibald G. Robertson,* for the plaintiff in error.

*Thomas O. Moss* and *Leith S. Bremner,* for the defendant in error.

GREGORY, J., delivered the opinion of the court.

Harry T. Wright instituted an action at law against the Virginia Electric and Power Company, a corporation, for damages for personal injuries sustained by him as the result of a collision between an automobile driven by him and one of the street cars of the Virginia Electric and Power Company. The parties will be referred to in accordance with the respective positions they occupied in the court below.

The case was tried by a jury and resulted in a verdict in favor of the plaintiff for $15,000, which was later approved by the trial court.

The collision occurred at the intersection of Monument avenue and Lafayette street in the city of Richmond at about 7:50 P. M. on March 21, 1936.

The negligence charged against the defendant was that its motorman unlawfully operated the street car on the occasion in question without a proper lookout and without proper warning of its approach, at an excessive speed, in violation of specified common-law duties and contrary to the ordinances of the city of Richmond.

Monument avenue is one of Richmond's thoroughfares and runs east and west. It has a double driveway separated by a grass plot or parkway 35 feet 10 inches wide. Each driveway is 32 feet 3 inches in width. The entire width of Monument avenue is 100 feet 4 inches. The driveway immediately north of the grass plot is for the use of west-bound traffic, while that immediately to the south is for east-bound traffic. The avenue is straight and level.

Lafayette street is also straight and level. It runs north and south, is about forty feet wide and carries the single track electric street-car line of the defendant.

The defendant owned and operated the street car which struck the plaintiff's automobile at the intersection. It was lighted and the motorman had an unobstructed view of the west-bound traffic. The weather was cloudy but dry and the visibility good. There was no traffic signal or traffic officer at the intersection.

At the time of the accident the plaintiff was on his way home, driving along the west-bound driveway of Monument avenue. He was familiar with the intersection.

The street car started north on Lafayette street, at its intersection with Monument avenue, from a "stand-still" position and increased its speed as it continued. Just prior to the accident, the plaintiff was driving at a speed of from twenty or twenty-five miles per hour, and, as he ap-

proached the intersection, he saw the street car on the opposite or south corner and saw that he had "plenty of time to clear the street car." He then put on his brakes which were in good condition and checked his speed. He looked to his right down Lafayette street for approaching traffic and saw that the way was clear. When within ten to fifteen feet of the car tracks he looked to his left again and saw the car "coming down on me, apparently at a pretty good rate of speed." He was then too close to the street car to stop so he turned his automobile to his right and was struck.

His injuries were serious and permanent. No question is made that the damages are excessive. The defendant company concedes that its primary negligence has been established, but claims that the plaintiff is barred of any recovery by his own contributory negligence as a matter of law.

We are often called upon to judicially determine in a given case whether the peculiar facts are sufficient to justify the court in submitting questions of negligence and contributory negligence to a jury, or whether the court from the facts, should pronounce, as a matter of law that negligence or contributory negligence exists, and thus withdraw these questions from the jury.

Whether a negligence case should be submitted to a jury or determined by the court must always turn on the peculiar facts in the particular case. It accomplishes nothing to refer to and quote from all of the negligence cases that have been decided by this court. Nor will it be advantageous to try to reconcile the cases. The principles are well settled. The application of them to the varying facts is a difficult problem. No two cases are identical in their essential facts. Generally, negligence is for the jury and should not be taken from it unless there is no real conflict. The verdict must stand in such cases unless there is a plain deviation from the evidence or it is palpable that the jury have not drawn the correct inference from the facts. This court has said time after time that if fair-

minded men may honestly differ from the proofs submitted as to the negligence or contributory negligence charged, the question is not one of law, but one of fact for the jury under proper instructions from the court.

Close and doubtful negligence cases frequently come to this court. If we review a judgment which approves a verdict in one of those cases and there appears to be nothing wrong with the verdict other than that it is doubtful whether it is sustained by the evidence, then it is our duty to affirm the judgment. The plaintiff in error must always bring to this court something more than just a close or doubtful case. He must bring a case with prejudicial and reversible error in it, pointing out specifically the prejudicial error he relies upon.

There have been negligence cases clothed with so much doubt that even the justices of this court have differed as to whether negligence or contributory negligence was a law question to be decided by the court or one of fact for a jury. When such is the case, it is conclusive that it should go to the jury, for the justices must be presumed to be fair-minded men, and if they differ, they honestly differ.

The motorman's conduct in this case was in reckless disregard not only of the safety of the plaintiff but of any other person who might have attempted to cross the intersection going in either direction. He was talking to a passenger and engaged in making change at a time when he was driving the heavy street car at night across an intersecting thoroughfare, instead of performing his strict and important duty of directing his attention to the traffic, keeping an active lookout and being alert to avoid injuring anyone. We think, to say the least, that this was a very gross form of negligence. He not only failed to keep a lookout but actually increased the speed of his car as he crossed Monument avenue. He had every reason to know of the traffic which would be encountered and must have known that this unreasonable conduct under the attendant circumstances would likely result in bodily harm to someone.

The danger of injuring someone at this particular intersection made it imperative that the motorman increase his vigilance and exercise care commensurate with the risk that might be encountered. Driving a street car without looking across the intersection involved great danger to others lawfully using the street and the motorman must have known it.

It is strenuously argued that the plaintiff's conduct in negotiating the intersection under the circumstances was the proximate cause of his injury, or efficiently contributed thereto, and that regardless of the negligence of the motorman, he is barred of any recovery as a matter of law.

Was the plaintiff acting in disregard of his own safety in attempting to cross the intersection under the circumstances? Did he possess knowledge of facts which would lead him, as a reasonable man in the exercise of ordinary care, to realize that such conduct created an unreasonable risk to himself? Did he exercise ordinary care for his own safety under the circumstances? The answer to these questions necessarily will determine whether the plaintiff was guilty of contributory negligence. Who is to answer them, the court or the jury?

We repeat, the defendant has conceded the negligence of the motorman in proceeding across the intersection without looking. The evidence discloses that he increased the speed of the street car as it proceeded. The plaintiff is not to be denied his recovery unless the evidence shows, as a matter of law, that he was guilty of such negligence as efficiently contributed to his own injury. Generally, at the trial by jury, the burden rests upon the defendant to show such negligence by a preponderance of the evidence, but here on appeal when the defendant asks us to hold, as a matter of law, that the plaintiff was guilty of contributory negligence, he must do more. He must show that there is no conflict in the evidence of contributory negligence, and that there is no direct and reasonable inference to be drawn from the evidence as a whole, sustain-

ing the conclusion that the plaintiff was free of contributory negligence.

Counsel for the defendant state and restate that the facts are such that fair-minded men can only draw one inference therefrom, that inference being that the plaintiff himself was guilty of negligence which bars his recovery. Then they rely upon the testimony of the plaintiff himself to establish that negligence, and upon this apparent admission of counsel for plaintiff in their brief: "The motorman, therefore, was not keeping a lookout ahead, and if he had, when he was at a point at least sixty (60') feet away, would have seen the plaintiff entering Lafayette street and going upon the tracks in time to have averted the accident." Again counsel for the defendant state that "In the instant case the plaintiff attempted to cross at an intersection after he had looked and had seen the street car bearing down upon him only sixty feet, i. e., one and one-half car-lengths, away from him." The substance of this last quoted statement is repeated fifteen times in the defendant's reply brief but not mentioned a single time in the petition for the appeal. No evidence is pointed out that sustains this statement. It is based solely on the purported admission of counsel for the plaintiff in their brief. In the petition for appeal counsel for defendant state that the plaintiff "drove into Lafayette street and upon the defendant's street railway track when he knew the defendant's electric street car was bearing down upon him less than three car lengths away."

The testimony of the plaintiff is, not that the street car was sixty feet away when he entered Lafayette street, nor three and a half car lengths away, but that it was moving off slowly from the south curb, "moving off slowly between the grass plot and the curb" when he entered Lafayette street. He said: "As I approached Lafayette street, I saw this street car on the opposite corner, on the south corner, I believe you would say. Isn't it? I tightened down on my brakes a little bit on approaching the entrance, looked down Lafayette street to make sure there were no automobiles crossing. I saw that I had plenty of time to

clear the street car, so I proceeded on, and I looked around again, and the street car was coming down on me, apparently at a pretty good rate of speed. I saw that I was in a close place, something had to be done quick. I was too close to the street car to stop, so the only thing for me to do would naturally have been to swerve my car a little bit to the right to avoid the car striking me."

The testimony shows that the plaintiff had been traveling twenty or twenty-five miles per hour prior to "tightening down" on the brakes. He stated that as he proceeded to enter the intersection he saw the street car crossing the east-bound driveway of Monument avenue and that it was moving along at apparently a "slow rate of speed." It must be borne in mind that the street car started from a "stand-still" position at the south side of the east-bound driveway of Monument avenue.

Again the plaintiff was asked, after he said he saw the street car moving slowly: "What did you do then?" He answered, "I proceeded on under the assumption that I had ample time to cross." He was then asked these questions and gave these answers: "Did you look to the left again after that?" Answer, "Yes, sir. After looking to my right I looked to my left again." Question, "What did you see?" He answered: "Saw the electric car bearing down on me." He also testified that when he saw the street car the second time it was "going pretty fast the last time."

Another witness for the plaintiff testified that he saw the street car and when it "got to the grass plot it had picked up speed," and again he said, "it speeded up."

The testimony also shows that the street car struck the automobile with considerable force. As one witness said, "Hit it right hard." The street car was derailed by the impact and when it was finally stopped it was "up on top the automobile." The automobile, a one-seated car, was struck near the left door.

In arriving at a proper conclusion regarding the degree of care exercised by the parties in a case of this kind, there are many things to be considered, such as distances,

speed and within what time and distance an automobile or a street car could be stopped,—all involving matters of opinion, estimates and best judgment. In giving testimony of estimates, it is natural that witnesses should differ. A jury is the better tribunal to form correct conclusions from this kind of evidence.

Our conclusion is that the contributory negligence of the plaintiff in the case at bar was a question to be decided by the jury and not by the court.

Counsel for defendant submits with great earnestness that the recent case of *Yellow Cab Co.* v. *Gulley,* 169 Va. 611, 194 S. E. 683, determines the case at bar against the plaintiff. There are many material facts in that case which do not appear in the present one and which in our judgment easily distinguish it. For instance, in that case the streets were wet and a monument with a circular iron fence was located in the middle of the intersection which caused traffic to be diverted around it. The corners of the streets are well rounded, thus causing the streets to intersect upon circles rather than at right angles. None of these conditions appears in the case at bar. In the *Yellow Cab Company Case* the plaintiff's car ran into the side of the defendant's cab and finally the plaintiff's chauffeur testified that he saw the defendant's cab being driven down the street at forty-five miles per hour when he attempted to cross in front of it. There are other distinguishing facts but those narrated will suffice.

The case of *Roanoke Railway & Electric Co.* v. *Korb,* 155 Va. 296, 154 S. E. 550, possesses more similar facts than any other case we have found. There the plaintiff drove across the intersection where the street railway company had its tracks and operated its cars when a street car appeared to be approaching some 200 feet away. Before he got across the tracks the street car bore down upon his car, struck it and injured the plaintiff. The verdict was for the plaintiff and it was sustained both by the lower court and this court. The defendant urged this court to hold as a matter of law that the plaintiff was guilty of contributory

negligence which barred his recovery. This we refused to do and held that it was not a question of law for the court but one of fact for the jury.

See also, *Virginia Electric & Power Co.* v. *Mitchell*, 159 Va. 855, 164 S. E. 800, 167 S. E. 424, and *Virginia Electric & Power Company* v. *Holtz*, 162 Va. 665, 174 S. E. 870.

We held in *Virginia Ry. & Power Company* v. *Meyer*, 117 Va. 409, 84 S. E. 742, that the public has the right to ride and drive across street car tracks in full view of approaching street cars if it is consistent with ordinary prudence to do so; that it is not negligence as a matter of law to drive across a street car track when one sees a street car approaching and that the question is not for the court but for the jury.

We are of opinion that the judgment is correct and should be affirmed.

*Affirmed.*

HOLT, J., dissenting.

If the plaintiff was guilty of negligence which contributed to his hurt, he cannot recover—certainly he should not.

Monument avenue is 100 feet, four inches, wide from curb to curb. In it there is a driveway for east and west bound traffic, each thirty-two feet, three inches wide, separated by a grass plot thirty-five feet, ten inches, wide in the center. Lafayette street is forty feet wide.

All quotations are from Wright's testimony. He tells us of the manner of his approach to Lafayette street:

"Q. Your best estimate of the speed at which you were going up to the time of the accident was you were going twenty or twenty-five miles an hour?

"A. I should say that was approximately the speed— between twenty and twenty-five.

"Q. When did you first slow down?

"A. On approaching the entrance to give myself a chance to look to the left. That is approximately.

"Q. Just approximately—a half or quarter or third of a block?

"A. I slowed down as far as from here across the room.

"Q. Would you say that is about fifty feet?

"A. I imagine so."

This cautious approach was made "to give myself a chance to look to the left."

He did look to the left. This is what he saw:

"I saw this street car on the opposite corner, on the south corner, I believe you would say."

These are his statements of what then followed:

"Q. As you approached Lafayette street, tell the jury what occurred and what you saw?

"A. As I approached Lafayette street, I saw this street car on the opposite corner, on the south corner, I believe you would say. Isn't it? I tightened down on my brakes a little bit on approaching the entrance, looked down Lafayette street to make sure there were no automobiles crossing. I saw that I had plenty of time to clear the street car, so I proceeded on, and I looked around again, and the street car was coming down on me, apparently at a pretty good rate of speed. I saw that I was in a close place, something had to be done quick. I was too close to the street car to stop, so the only thing for me to do would naturally have been to swerve my car a little bit to the right to avoid the car striking me."

　　　*　　*　　*　　*　　*　　*　　*

"Q. As you proceeded on up west on Monument avenue, did you or not see the street car crossing the eastbound driveway on Monument avenue?

"A. It was moving along at apparently a slow rate of speed."

"Q. What did you do then?

"A. I proceeded on under the assumption that I had ample time to cross.

"Q. Did you look to the left again after that?

"A. Yes, sir. After looking to my right I looked to my left again.

"Q. What did you see then?

"A. Saw the electric car bearing down on me.

"Q. Now, then, when you reached Lafayette street (I mean reached the curb line extended on Lafayette street) where was the street car?

"A. The street car was moving off slowly between the grass plot and the curb.

"Q. Which curb?

"A. Left-hand curb.

"Q. Do you mean the south curb?

"A. Yes, sir."

Later he said that the car, as it crossed the eastbound driveway, was moving "at a reasonable rate of speed." To clear up any confusion, the court made this statement:

"He said he saw the car on the south side of Monument avenue, then he looked to the right in Lafayette street and then looked to the left and saw the car.

"Witness: That is right.

"By Mr. Moss:

"Q. Do you know at what speed was the street car going when you looked the second time? Was it going slow or fast?

"A. Going pretty fast the last time."

All of this was on direct examination. This appears in his cross examination:

"Q. How far away from you was the street car when you looked back to the left and saw it?

"A. When I looked back the street car was a very short distance from me then.

"Q. Approximate it?

"A. Probably ten or fifteen feet.

"Q. It was then that you swerved to the right?

"A. Yes, sir."

As bearing upon distances, Wright tells us that when he first saw the street car, it was by the south corner of Monument avenue and Lafayette street, and when he ceased to observe it upon that occasion, he tells what the situation then was:

"Q. Mr. Wright, did I understand you to say that this street car was coming across the eastbound driveway of Monument apparently at a slow rate of speed?

"A. Yes, sir, at a reasonably slow rate of speed."

This was his last statement on direct examination upon this subject.

The car itself was forty feet long. These driveways on Monument avenue are each thirty-two feet, three inches, wide; the grass plot is thirty-five feet wide. It is fair to assume that half of this car was across the south track of the avenue for it had traveled from the corner and "was coming across the eastbound driveway." The evidence shows that the collision was about the center of the westbound driveway, which would indicate that the car was about sixty-seven feet from the point of collision when Wright last saw it during the period of his first observation. Counsel for the plaintiff in his brief gives us this view as to distances:

"The motorman, therefore, was not keeping a lookout ahead, and if he had, when he was at a point at least sixty (60') feet away, would have seen the plaintiff entering Lafayette street and going upon the tracks in time to have averted the accident.

"At the conclusion of the plaintiff's case, no motion was made to strike the evidence of the plaintiff upon the ground either that the defendant was not guilty of negligence or that the plaintiff was guilty of contributory negligence, nor was such a motion made at the conclusion of all of the testimony. The verdict is not attacked because it is excessive."

In considering evidence, even on a demurrer, we take the testimony of a witness as a whole, and where he makes a number of statements more or less confusing and then undertakes to clear up that uncertainty, we accept his final declaration as embodying what he really desires to be understood as saying. Moreover, on demurrer we usually accept final statements made on cross examination; otherwise no prudent lawyer would cross examine a witness at all, for he

might make out a case in testifying in chief, admit on cross examination that he was all wrong, and yet recover.

It is plain from the testimony of this witness that he saw this street car but twice—on the first occasion, it was moving across the eastbound lane "at a reasonable rate of speed," and on the second occasion, it was "probably ten or fifteen feet" away and going "pretty fast."

These facts present this problem: Can a man who sees a street car sixty or seventy feet away, moving at "a reasonably slow rate of speed," undertake to cross its path without looking, "under the assumption that I (he) had ample time to cross," and to rest secure under that assumption and not look again until too late?

Wright's explanation is this: He tells us that he looked to the right for possible oncoming traffic and continued to look until the street car was ten or fifteen feet away. There was no oncoming traffic, and there was nothing to confuse him. Had any come south on Lafayette street, it would, as a matter of fact, have been on its left side. He ignored a danger presently imminent to search for one non-existent. The plain truth is that he thought he could beat this car to the crossing and paid no further attention to it until too late.

Street cars have to run upon their tracks—if they run at all. Automobiles are not thus limited.

Suppose Wright had been driving a heavy truck instead of a light passenger car and had injured some street car passenger? Could he be held guiltless?

Might not the passenger say to the truck driver:

"You knew that my car was coming; you knew that your course would lead you to cross its right of way, and you knew the possibilities of a collision, yet with all this before you, and with no other peril threatening, you deliberately looked away and continued to look away until it was too late. You were not merely heedless, not merely negligent but grossly negligent."

By way of obiter, the court has said:

"There have been negligence cases clothed with so much doubt that even the justices of this court have differed as to whether negligence or contributory negligence was a law question to be decided by the court or one of fact for a jury. When such is the case, it is conclusive that it should go to the jury, for the justices must be presumed to be fair-minded men and if they differ, they honestly differ."

If this be true, then in a case where the issue presented is in substance that now before us, it would be in the power of one justice to uphold a verdict which his six associates thought plainly wrong. His dissent would be conclusive. It is but another step to say that members of the jury are reasonable men, just as reasonable as we are, and that such a difference of opinion between reasonable men should leave matters as they were.

For the foregoing reasons, I am compelled to dissent.

EGGLESTON, J., concurs in this dissent.