## Richmond

### The Virginia And Maryland Railroad Company

### v.

### Carolyn Jean White, Administratrix, Etc.

Record No. 811881.

September 7, 1984.

Present: All the Justices.

*Daniel Hartnett (Ayres, Hartnett & Custis,* on briefs), for appellant.

*Stanley E. Sacks (Girard C. Larkin, Jr.; Baxley T. Tankard; Sacks, Sacks and Larkin,* on brief), for appellee.

STEPHENSON, J., delivered the opinion of the Court.

Carolyn Jean White, Administratrix of the Estate of Charles Edward White, Jr. (White), sued The Virginia and Maryland Railroad Company (the Company) to recover damages for White's alleged wrongful death. Following a jury trial, a $602,974.65 verdict was returned in White's favor. Judgment was entered on the verdict, and the Company appeals. The sole question on appeal is whether White was guilty of contributory negligence as a matter of law.

Because White prevailed in the court below, we will state the evidence and all reasonable inferences deduced therefrom in the light most favorable to him. The accident causing White's death occurred on August 22, 1980, approximately 8:30 p.m., on U.S. Route 13 in rural Northampton County where Route 13 crosses the Company's railroad tracks. Route 13 is a four-lane, divided highway with two lanes each for northbound and southbound traffic. Each lane is 12 feet wide. The speed limit on the relatively

level highway is 55 miles per hour. At the time of the accident, it was dark and overcast, and the road surface was dry.

A traffic light, located 320 feet north of the railroad crossing, regulates traffic at the intersection of Route 184, Business Route 13, and Route 13. Approximately 800 feet north of the traffic light, Route 13 curves slightly to the right in a southerly direction, and then straightens in the vicinity of the traffic light.

The railroad crossing is equipped with a warning device, consisting of automatic gates with lights attached and blinking lights mounted on elevated crossbucks. Only red lights are used on the warning system. Before a train crosses the highway, the gates are lowered, blocking the tracks from highway traffic, and the red lights on the gates and the crossbucks blink continuously. However, at the time of the accident, and for approximately 36 hours prior thereto, the warning device was not operational. The Company had tied up the gates with ropes while repairing the tracks. White was thoroughly familiar with the crossing, having crossed it "[a]bout twice a day" for three or four years.

Shortly before the accident, a Company train was endeavoring to cross Route 13 in an easterly direction. As the train approached the crossing, the engine was pushing two dark-colored, unlit tank cars, each 40 feet in length. The engine was also pulling seven other cars. Because the automatic warnings were inoperable, the train's conductor was responsible for "flagging" the crossing, which he attempted to do by using a small "brakeman's hand lantern" with a white light bulb.

The conductor stopped the train approximately 15 feet from the crossing to perform his flagging duties. While three vehicles were stopped at the traffic light, the conductor signaled for the train to begin backing across Route 13.

By the time the traffic light turned green, the first tank car was completely blocking the southbound lanes of the highway. The three vehicles moved south and stopped at the crossing. All were in the right-hand lane, although one may have been slightly astraddle the center line.

At this time, the conductor first saw White's vehicle (a white van) at the traffic light. The van was in the right-hand lane, and the conductor testified that it "just steadily drifted over" into the passing lane. He said White's vehicle did not swerve and it was not being operated erratically.

The conductor began waving his lantern when he observed White's vehicle, but White quickly traversed the distance from the traffic light to the crossing and, while in the passing lane, struck the right rear "catwalk" of the tank car. (A civil engineer testified that a vehicle traveling at a speed of 55 miles per hour would cover the distance in approximately four seconds.) The investigating police officer found braking tire marks before impact of 33 feet, eight inches, made by White's left front tire and 23 feet, three inches, made by his right front tire.

A resident engineer for the Virginia Department of Highways and Transportation, who is responsible for highway safety, testified that when the automatic warning device is inoperable, "there should be some substitute warnings" at the crossing. An expert witness with extensive training and experience in the railroad industry testified regarding the acceptable and proper substitute warnings. He stated that the proper method of "flagging" the crossing was with the use of "fusees," which he described as "flare[s]" which burn for 10 to 15 minutes and produce a "brilliant red glow and light and can be seen for just miles." The use of fusees is particularly important in the nighttime. He opined that attempting to flag the crossing with a brakeman's hand lantern emitting a white light was not the standard, acceptable practice in the industry. Generally, the lantern is merely used to signal a train's engineer. If the lantern is to be used for flagging, a red bulb should replace the white bulb.

The conductor stated that he had been taught to use fusees and had intended to use one on the night of the accident. He explained that when he looked into the box where the fusees were ordinarily kept, none was there. Therefore, he had no other means of flagging the crossing except the brakeman's lantern.

A toxicologist testified that he tested a sample of White's blood, which contained .11% alcohol. In his opinion, .11% alcohol in the blood would impair an average person's faculties. He stated, however, that many toxicologists believe that an alcohol content below .10% would not cause "sufficient impairment to make a difference." Two eyewitnesses who saw White shortly before the accident testified that he appeared normal in speech, walk, and appearance, and showed no signs of being intoxicated.

Contributory negligence, like negligence and proximate cause, is ordinarily a factual issue for resolution by a jury. The issue becomes one of law, to be decided by a court, only when

reasonable minds could not differ concerning the conclusion to be drawn from the evidence. *Meeks* v. *Hodges,* 226 Va. 106, 109, 306 S.E.2d 879, 881 (1983). It is the jury's function to resolve and settle all conflicts in the evidence, and on appeal, a litigant who is fortified by a jury's verdict and a trial court's judgment thereon "occupies the most favored position known to the law." *Pugsley* v. *Privette,* 220 Va. 892, 901, 263 S.E.2d 69, 76 (1980).

> The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. . . . That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

*Bly* v. *Southern Ry. Co.,* 183 Va. 162, 175, 31 S.E.2d 564, 570 (1944) (citations omitted) (quoting *Tennant* v. *Peoria & P. U. Ry. Co.,* 321 U.S. 29, 35 (1944)).

A defendant relying upon a plaintiff's contributory negligence as a defense has the burden at trial of proving by a preponderance of the evidence that the plaintiff was negligent and that his negligence proximately caused his injuries. *Whitfield* v. *Dunn,* 202 Va. 472, 477, 117 S.E.2d 710, 714 (1961). On appeal, however, a defendant who claims that the plaintiff is guilty of contributory negligence as a matter of law has the heavier burden of showing "that there is no conflict in the evidence of contributory negligence, and that there is no direct and reasonable inference to be drawn from the evidence as a whole, sustaining the conclusion that the plaintiff was free of contributory negligence." *Va. Elec. & Power Co.* v. *Wright,* 170 Va. 442, 448-49, 196 S.E. 580, 582 (1938), *quoted in VEPCO* v. *Winesett,* 225 Va. 459, 464, 303 S.E.2d 868, 872 (1983). Moreover, absent evidence to the contrary, a decedent is presumed to have exercised reasonable care

for his own safety and to have acted only as an ordinarily prudent man would have acted under the circumstances. *Hagan* v. *Hicks*, 209 Va. 499, 505, 165 S.E.2d 421, 426 (1969); *Unger* v. *Rackley*, 205 Va. 520, 527, 138 S.E.2d 1, 6 (1964).

When gates, lights, and other automatic safeguards are installed at railroad crossings to warn highway travelers of approaching trains, a traveler has the right to presume that the safeguards will be reasonably well-maintained and to place some reliance upon them. Although the safeguards do not relieve a traveler from exercising ordinary care and caution for his own safety, he is not required to exercise the same degree of care and caution as will be required of him when no safeguards are maintained. Under these circumstances, the question of whether he is negligent "is peculiarly one for the consideration of the jury." *Southern Ry. Co.* v. *Campbell*, 172 Va. 311, 321, 1 S.E.2d 255, 259 (1939).

In contending that White was guilty of contributory negligence as a matter of law, the Company claims that White failed to keep his vehicle under proper control, operated it while under the influence of intoxicants, and failed to keep a proper lookout. The jury reasonably could infer from the conductor's testimony that White was using ordinary care to keep his vehicle under proper control. Indeed, the conductor stated that White drifted from the right-hand lane into the passing lane as he approached the traffic light and his vehicle was not being operated in an erratic manner. Moreover, no evidence was presented suggesting that White was operating his vehicle at an unlawful speed, and the verdict indicates that the jury found his speed was not unreasonable under the existing conditions.

There was conflicting evidence whether White may have been under the influence of alcohol. The toxicologist testified that .11% of alcohol in the blood of an average person would cause "impairment of [his] faculties." On the other hand, two witnesses, both of whom had been in White's company immediately prior to the accident, testified that White showed no signs of intoxication. This issue was submitted to the jury, and in view of the conflicting evidence, was a matter within the jury's province.

The Company contends that White failed to use ordinary care under the circumstances to keep a proper lookout. White approached the traffic light on a dark, overcast night, while negotiating a slight curve to his right. He knew the crossing was equipped with automatic warning devices, and he had a right to presume

they were working. They were not operational, and a dark-colored tank car was blocking the highway. The jury found that the defendant was negligent in failing to adequately warn White of the danger ahead of him. This finding has not been challenged on appeal. The Company's negligence was a significant factor to be considered by the jury in determining whether White failed to exercise ordinary care to keep a proper lookout. Thus, viewing the evidence and all of its fair and reasonable inferences in the light most favorable to White, we conclude that reasonable minds could differ respecting whether he was keeping a proper lookout.

We hold, therefore, that the trial court properly submitted the issue of White's contributory negligence to the jury, and, accordingly, its judgment will be affirmed.*

*Affirmed.*

THOMAS, J., dissenting.

The majority goes to great lengths to detail the negligence of the railroad with regard to the type of warning signal it used on the night of the accident. The majority seems to suggest that as proof of defendant's negligence increases the possibility of plaintiff's contributory negligence decreases. Such an approach has never been accepted in the Commonwealth. In our State, even though there is proof positive of defendant's negligence if plaintiff is shown to be contributorily negligent and that negligence is a proximate cause of the accident, then plaintiff cannot prevail regardless of the relative degrees of culpability between plaintiff and defendant.

In my view, the majority has focused its analysis in the wrong place. Even if we concede that there was overwhelming proof of the railroad's negligence, the question still remains whether the decedent, in driving into the side of a train, fell below the standard of care owed by a reasonably prudent driver under the circumstances. To answer that question, we should set to one side the facts and circumstances which establish the railroad's negligence and concentrate upon the facts and circumstances under which decedent operated.

The pertinent facts are as follows: decedent crossed the tracks at least twice per day and was thoroughly familiar with the cross-

---

* The provisions of Code § 56-416 were not in issue in this case.

ing. He knew, or should have known, that the crossing signals were out of order when he went to work on the day of the accident because they were tied up at the time. As he approached the train tracks on his way home, he saw, or should have seen, three cars completely stopped in the right hand lane of the highway on which he was traveling. He was bound to know the cars were stopped just in front of the crossing because he was familiar with its location. The train was blocking the highway and blocking decedent's usual view down the road. A railroad employee was signaling with a lantern to warn decedent to stop.

Under the foregoing facts and circumstances, decedent should not have driven headlong into the side of the train. First, he knew where the tracks were and tracks by themselves warn of danger. *Gardner* v. *Old Dominion Stev. Corp.*, 225 Va. 599, 604, 303 S.E.2d 914, 917 (1983). Thus, even if he had been on the road alone he should have exercised caution in crossing the tracks. Yet, in this case he had a further warning. Three cars were stopped in the highway directly in front of the tracks. The presence of those cars should have warned decedent of the need to slow down. A reasonably prudent driver would not expect to find three cars stopped in a highway, just shy of a rail crossing, unless something was happening or had happened to cause them to stop. Decedent did not slow down to investigate nor did he proceed with caution. He simply pulled into the passing lane and crashed into the side of the train.

In my view, decedent failed to see what was there to be seen. Even if the train itself were difficult to see the same cannot be said for the three cars. Even if decedent was accustomed to seeing flashing red lights and a cross-arm as an indicator of the presence of a train, he should have been on the alert for some other type signal since, on the way to work, he saw, or should have seen, that the customary signal devices were out of order.

In my opinion, a reasonably prudent driver in decedent's position and under the attendant circumstances would have slowed down and thus avoided the collision. About this I do not believe reasonable men could differ. I would, therefore, reverse the judgment of the trial court and enter final judgment for the railroad.

CARRICO, C.J., joins in dissent.