Present:  Carrico, C.J., Compton, Stephenson,[1] Lacy, Keenan, and
Koontz, JJ., and Whiting, Senior Justice

MORRISON-KNUDSEN
COMPANY, INC., ET AL.
                                          OPINION BY
v.   Record No. 961606          CHIEF JUSTICE HARRY L. CARRICO
                                       September 12, 1997
ALTON BRUCE WINGATE

          FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
                      Robert W. Curran, Judge

     In this slip-and-fall case, a jury awarded the plaintiff,

Alton Bruce Wingate, a verdict for $300,000 against the

defendants, Morrison-Knudsen Company, Inc. and Eugene W. Kelsey &

Son, Inc., a joint venture operating under the name of Kelsey &

Associates.  The trial court entered judgment on the verdict, and

we awarded the defendants an appeal.

     The plaintiff was injured when he slipped and fell on an

outside stairway at Building 1949 in a housing complex at the

Naval Weapons Station in Yorktown.  Building 1949 was one of 36

two-story buildings containing a total of 232 housing units for

which the defendants were awarded a construction contract by the

United States Navy Department in 1981.  Pursuant to the contract,

the defendants acted as architect and designer as well as general

contractor for the project, including the exterior stairways.

     Building 1949 was the first structure erected, and it was

used as a prototype for the remaining thirty-five buildings.  The

second-floor units in each building were reached by an exterior

stairway in the shape of a "Y," with the leg of the "Y" joined to

---

[1]Justice Stephenson participated in the hearing and decision
of this case prior to the effective date of his retirement on
July 1, 1997.

the arms by a landing located approximately one-third of the way up the stairs.

The original shop drawings for the prototype stairway specified a "steel trowel finish" for the precast concrete treads and landing, meaning that the finish would be "relatively smooth," and the treads and the landing on the stairway in Building 1949 were finished in this manner. However, after Building 1949 was completed, "the Navy . . . decided [it] wanted broom finish instead of steel-trowel finish" on the stair treads, and a change order was issued directing the replacement of "[s]tair treads at Bldg. 1949." A note on the change order stated that the "[o]riginal stair treads were smooth [and should] have been rough texture." The change order made no mention of the landing on the stairway in Building 1949.

The stair treads in Building 1949 were replaced with treads having a "broom finish," meaning that "you still trowel [the concrete], and then you run a broom over it to get a slight texture."[2] C.H. Morgan, the framing subcontractor who originally erected the prototype stairway, was employed to do the replacement work. He asked a representative of the defendants why the landing was not being replaced and was told that the surface of the landing would be roughened by application of an epoxy material. However, the finish on the landing was still smooth when he examined it some time later.

The plaintiff was employed by a private commercial firm to

---

[2]A broom finish was used on the treads and landings on the stairways of the remaining 35 buildings in the housing complex.

perform maintenance work at the housing complex after it was completed. On August 14, 1984, he had been working in a second-floor unit of Building 1949 when it began to rain. Walking briskly down the stairway to raise the windows on his van, he slipped on the wet landing and fell to the bottom of the stairs, suffering the injuries for which he sought damages in the action filed below. He examined the landing the day after he fell and found it was composed of "real smooth concrete," unlike the "rough, broom-finished concrete" on the steps.

On appeal, the defendants argue that actionable negligence requires proof of a legal duty to exercise ordinary care for the safety of another person, a breach of that duty, and an injury proximately resulting from the breach. The defendants say that the plaintiff was required to establish by the use of expert testimony what duty they owed him as designers and general contractors, yet the plaintiff failed to produce such expert testimony. Furthermore, the defendants submit, there was no showing that they breached any duty they owed the plaintiff; he produced no evidence to show that the trowel finish was unfit or unsafe for use on an exterior landing or that the trowel finish constituted a defect in the premises. Hence, the defendants conclude, their motions to strike and for summary judgment, made below, should have been granted.

The plaintiff responds that expert testimony was not required to establish the defendants' duty because this is a case "in which the facts and circumstances are within the common understanding and experience of the average lay juror." The

plaintiff maintains that "[f]or a proper statement of the duty owed to a person injured by a defective condition created by a contractor, the court must look to tort law and apply the objective standard of the reasonably prudent man."

Here, the plaintiff says, there was "ample evidence from which the jury could conclude that [the defendants] failed to use ordinary care in creating and failing to repair the condition that caused [the plaintiff's] injury." The evidence showed, the plaintiff submits, that the defendants failed to use ordinary care "in (1) designing a stairway composed of a smooth concrete surface exposed to the weather, (2) replacing all but one surface when the owner rejected it as too smooth, and (3) failing to perform the repair they arranged for (application of epoxy)." Hence, the plaintiff concludes, the trial court did not err in refusing to grant the defendants' motions to strike and for summary judgment.

For purposes of this discussion, we will assume, without deciding, that the plaintiff is correct in his assertion that expert testimony was not required to prove what duty the defendants owed him, and we will agree with the plaintiff that the defendants owed him the duty of ordinary care. Yet, there remained upon the plaintiff the burden of showing a breach of that duty by producing evidence of a non-expert nature establishing that the smooth finish on the landing in the stairway of Building 1949 constituted what the plaintiff calls "a hazardous condition . . . created by [the defendants] which they failed to repair."

We are of opinion that the plaintiff failed to carry his burden. Indeed, at best, the plaintiff's evidence may be described as sketchy. He cites the testimony of the defendants' quality control officer that there is no custom in the building industry concerning broom-finished versus trowel-finished concrete. The plaintiff also cites the testimony of the defendants' project manager to the effect that he was unfamiliar with building code requirements. The plaintiff then argues that if the defendants could have shown that they had complied with applicable industry standards or building codes, "they would have done so."

The difficulty with this argument is that the burden was not upon the defendants to show that they complied with industry standards or building codes, if any were applicable. Rather, the burden was upon the plaintiff to show that the defendants deviated from the standard of ordinary care, either by failing to observe applicable trade customs and building code provisions or by some other defalcation.

The plaintiff also cites an "acknowledgement" by the defendants' quality control officer that broom-finished stair treads "give you more traction" than smooth-finished treads, especially in damp "climates such as you have in Yorktown," and that if he were building the stairs and landings, he would prefer a "real light broom finish." Further, the plaintiff cites a statement by the defendants' project manager to the effect that he did not know why the Navy requested the change to broom-finished treads "other than that they wanted the stair treads to

be rougher."

However, all that this evidence establishes is the obvious: broom-finished concrete provides a rougher surface with better traction than smooth-finished concrete.  It does not prove that a smooth finish is inherently unsafe or unfit for use on an exterior landing.  Simply because one method of finishing concrete may be better or preferable to another does not mean that the other is necessarily unacceptable or that its use would constitute negligence under circumstances similar to those present here.

Next, the plaintiff cites the testimony of C.H. Morgan, the framing subcontractor who originally erected the prototype stairway and later replaced the treads pursuant to the change order.  Morgan stated that in his forty years of building experience, he had never seen smooth-finished concrete used in a public area.

But Morgan's "business, . . . on this particular project, was to do carpentry and framing and trim work."  He had never participated in the design of concrete forms or concrete structures, had no expertise in concrete, and was only generally familiar with what concrete finishes are used on common walkways and areas.  While he found the use of smooth-finished concrete in a public area unusual, he did not question its use on the prototype stairway.  And the fact that one person may never have seen smooth-finished concrete used in a public area does not make its use in this particular case a breach of the duty to use ordinary care.

Finally, the plaintiff puts great emphasis upon the change order requiring replacement of the treads on the prototype stairway because the "[o]riginal stair treads were smooth [and should] have been rough texture."  The plaintiff says that the defendants prepared the plans and specifications for the prototype stairway, which allowed the use of smooth-finished concrete, that "[t]he Navy rejected the plans and ordered them changed," and that the defendants complied with respect to all the buildings in the housing project except Building 1949.  "In other words," the plaintiff states, "these were [the defendants'] own plans, [they] were not approved but rejected and not followed as modified."

However, there is nothing in the record to justify the view that the Navy ever "rejected" the use of smooth-finished concrete on the treads and landing in the stairway of Building 1949.  Rather, the evidence shows that the original plans and specifications were approved and that the stairway was erected with smooth-finished concrete in accordance with those plans and specifications.  Only later did the Navy indicate that it "wanted" the smooth treads replaced by treads with a rough finish.  The change order was then issued and the treads were replaced.  This goes to prove nothing more than that the Navy changed its mind about the type of finish it wanted on the stair treads in Building 1949.

Furthermore, the change order made no mention of the landing in question.  Therefore, the order cannot be construed, as the plaintiff would have us construe it, as imposing upon the

defendants an obligation to "follow" the order by replacing not only the stair treads but also the landing with broom-finished concrete.

We are not unmindful of the maxim that, "on appeal, a litigant who is fortified by a jury's verdict and a trial court's judgment thereon 'occupies the most favored position known to the law.'" Virginia & Maryland R.R. v. White, 228 Va. 140, 145, 319 S.E.2d 755, 758 (1984) (quoting Pugsley v. Privette, 220 Va. 892, 901, 263 S.E.2d 69, 76 (1980)). But it is the duty of this Court to set aside a jury verdict, even though approved by the trial court, when it is not supported by evidence and could only have been reached through speculation and conjecture. Wagman v. Boccheciampe, 206 Va. 412, 418, 143 S.E.2d 907, 911 (1965).

Here, the plaintiff failed to establish that the use by the defendants of smooth-finished concrete on the landing in question constituted a defect or a hazardous, unsafe, or unfit condition which the defendants were bound to repair. Therefore, the jury's verdict finding that the defendants breached their duty of ordinary care is not supported by evidence and could only have been reached through speculation and conjecture. Accordingly, we will reverse the judgment of the trial court, set the jury verdict aside, and enter final judgment here in favor of the defendants.

Reversed and final judgment.